DICKERSON et al. v. MAURER.

(Circuit Court, E. D. Pennsylvania. April 25, 1901.)

No. 33.

PATENTS—VALIDITY AND INFRINGEMENT—PHENACETIN.

The Hinsberg patent, No. 400,086, for the chemical product known commercially as "phenacetin," which is a valuable remedy, largely used by the medical profession since its production by the patentee, *held* not anticipated, valid, and infringed.

In Equity. Suit for infringement of patent. On final hearing.

Livingston Gifford and Anthony Gref, for complainants.
Hector T. Fenton, for respondent.

J. B. McPHERSON, District Judge. The patent in suit, No. 400,-086, was granted in March, 1889, and is not for a process, but for the chemical product known commercially as "phenacetin." When the action was begun, the patent was owned by Edward N. Dickerson, one of the complainants, but since February 10, 1899, it has been, and is now, the property of the other complainant, the Farbenfabriken of Elberfeld Company. The specification and claim are as follows:

"Be it known that I, Oskar Hinsberg, a citizen of the empire of Germany, residing at Barmen, in the said empire, have invented a useful improvement in the manufacture of a new pharmaceutical product, of which the following is a specification:

"My invention relates to the production of a new pharmaceutical product, a new antipyretic and antineuralgic, obtained by reducing nitrophenetol, and melting the phenetidin chlorhydrate thus formed with dried sodium acetate and acetic acid.

"In carrying out my process practically, I proceed as follows: Fifty kilos of the potassium salt of paranitrophenol are mixed with three hundred kilos of alcohol, adding forty kilos of bromaethyl. The mixture is heated in an autoclave, at a pressure of three to four atmospheres, during about eight hours. At this time the reaction is finished, whereby paranitrophenetol is obtained according to the following equation:

$$\underset{NO_2}{\overset{ONa}{C_6H_4}} + C_2H_5Br = \underset{NO_2}{\overset{OC_2H_5}{C_6H_4}} + BrNa$$

"In order to separate the mononitrophenol, which has not taken any part in the process, from the ether recently formed, the solution is treated with steam. By this operation the ether distills, leaving behind the paramononitrophenol.

"For the reduction of the paranitrophenetol forty kilos of this ether are mixed with sixty kilos of muriatic acid and sixty kilos of water. To this mixture are gradually added, at a temperature of 70° centigrade, twenty-five kilos of iron filings, the whole being stirred continually. As soon as the ether is entirely reduced, para-amidophenetol is obtained, as explained by the following equation:

$$\overset{\displaystyle OC_2H_5}{\underset{\displaystyle NO_2}{C_6H_4}} \quad +H_6=\overset{\displaystyle OC_2H_5}{\underset{\displaystyle NH_2}{C_6H_4}} \quad +2H_2O$$

"The solution obtained in this manner is saturated with chalk diluted with water, and for the purification of the amido compound treated with steam the distillate is absorbed in water acidulated by muriatic acid. The muriatic salt of the para-amidophenetol crystallizes in white leaves. Fifty kilos of this product are melted with one molecule of melted acetate of sodium and twenty-four kilos of glacial acetic acid. The melted mass is repeatedly boiled with water, and the new monoacetylparamidophenetol obtained from the filtrates after cooling. It has the following chemical formula:

$$\text{Para } \overset{\displaystyle NH(C_2H_3O)}{\underset{\displaystyle OC_2H_5}{C_6H_4}} \quad =C_{10}O_2H_{13}N$$

—And is obtained according to the following equation:

$$\text{Para } \overset{\displaystyle NH_2}{\underset{\displaystyle OC_2H_5}{C_6H_4}} \quad +CH_3COOH=\overset{\displaystyle NHC_2H_3O}{\underset{\displaystyle OC_2H_5}{C_6H_4}} \quad +H_2O$$

"The monoacetylparamidophenetol crystallizes in white leaves, melting at 133° to 136° centigrade. It is tasteless, little soluble in cold water, more so in hot water, but easily in alcohol, chloroform, benzole, etc. It is altogether different from the body described in the Year Book of Pharmacy 1883, page 146, denominated 'phenacetein.' The formula of phenacetein is $C_{10}H_{12}O$; that of phenacetin, $C_{10}H_{13}O_2N$,—my product containing nitrogen, contrary to phenacetein. The phenacetein represents a coloring matter, an amorphous carmine red powder, the acid solution of which is yellow, the alkaline raspberry red; while my phenacetin is colorless, crystallizing in white leaves, not changing color by addition of acids or alkalies.

"Having thus described my invention, what I claim as new, and desire to secure by letters patent, is:

"The product herein described, which has the following characteristics: It crystallizes in white leaves, melting at 135° centigrade; not coloring on addition of acids or alkalies; is little soluble in cold water, more so in hot water; easily soluble in alcohol, ether, chloroform, or benzole; is without taste, and has the general composition $C_{10}H_{13}O_2N$."

The defendant infringed the patent during the ownership of each complainant, by selling in this district, without proper license, the identical chemical product described in the claim. There is no other chemical substance than phenacetin that possesses all the characteristics specified in the claim, and these characteristics are possessed by the substance sold by the defendant. Indeed, there is no real

dispute concerning the substance sold by the defendant. The chief controversy has been waged over the validity of the patent, and infringement cannot be seriously denied, if the letters are good.

Several defenses are set up, but, in my opinion, only one defense calls for consideration, namely, whether the invention was anticipated by a published article known in the testimony as the "Hallock Publication." Upon this point the relevant facts are as follows: If the Hallock publication does not anticipate the patent, phenacetin was invented by Oskar Hinsberg, a chemist in the employ of Bayer & Co., at Elberfeld, Germany. It is an acetyl derivative of paramidophenetol, its chemical name being monoacetylparamidophenetol, although it is sometimes called also "Acetphenetidin." Before February 26, 1887 (to use the language of one of the witnesses,—Complainants' Record, p. 43), "Hinsberg was for some time engaged with the chemical investigation of certain amidophenols and their acetyl derivatives. After the production by him of these new bodies, and after the discovery of their nature and properties, he associated with himself Prof. Kast, a physician, who at that time taught at the University of Freiburg. Hinsberg produced and discovered the new body, and suggested its utility in medicine, but as he was a chemist, and not a physician, he was unable to sufficiently test its effects as a medicine by submitting his new drugs to clinical experiments and observations, and therefore associated himself with Prof. Kast for these purposes. Of course, after the discovery of a medicinal body, it is necessary that its action should be tried for a long period to determine the best way of administering it, and in what cases it should and should not be administered, and what are its effects, both ultimate and approximate, before it can safely be placed upon the general market."

On February 26, 1887, the result of these investigations and experiments was given to the world in the Centralblatt für die Medicinischen Wissenschaften, a German periodical, in an article published by Hinsberg and Kast "On the Action of Acetphenetidin," this being one chemical name of the patented substance. For present purposes, this date is accepted by both parties as the true date of the Hinsberg invention; and therefore if the Hallock publication, which appeared in 1879 or 1880, properly describes phenacetin, within the rules of law upon this subject, the defense of anticipation is made out. The Hallock article is as follows:

"Phenetol is violently attacked by fuming nitric acid, but is unaffected by concentrated nitric acid, in the cold. Cahours, who first tried the action of fuming nitric acid upon phenetol, obtained, he says, both a solid and liquid product. The former he analyzed, and found to be dinitrophenetol; the latter he supposed to be mononitrophenetol. The writer repeated these experiments with somewhat different results. The dark red viscous liquid obtained by the action of fuming nitric acid upon pure phenetol, or on a solution of phenetol in acetic acid, was distilled in a current of steam. The product consisted of a solid and a liquid, in varying proportions according to the conditions of the nitration. The solid, when purified by repeated recrystallization, both from acid and from alcohol, was proved by an ultimate analysis to be a mononitrophenetol. Its melting point, 58° C., and other physical properties, coincided with that of paramononitrophenetol, prepared by Fritzsche in 1858 by the action of iodide of ethyl upon the silver salt of paranitrophenol. The

writer also obtained the same body by the action of potassium ethylic sulphate and potassic hydrate upon paranitrophenol in sealed tubes at high temperatures. In this operation, however, a considerable quantity of the nitrophenol remained unchanged. Iodide of ethyl and potassic hydrate heated in a sealed tube with paranitrophenol also yielded, as was expected, the same body, but quite impure. The method of direct nitration yields the purest product, but is quite tedious. When the nitration was performed with nitric acid, from which the red fumes had been removed by previously boiling, or by means of hot concentrated acid, the product is mostly liquid, and refused to crystallize, even at low temperature. This liquid was apparently a mixture of orthonitrophenetol and unchanged phenetol holding some paranitrophenetol in solution.

"Having obtained a considerable quantity of the paranitrophenetol, an attempt was made to reduce it by means of tin and hydrochloric acid. The resulting salt, after the removal of the tin with sulphydric acid, crystallized from water, in which it was very soluble, in rhombic plates with a pearly lustre. An ultimate analysis established the composition as HCL. $C_6H_4NH_2$ $\overset{\displaystyle C_2H_5O}{}$ With platinum chloride it yielded a very beautiful double salt in bright golden flakes, but easily decomposable, especially when heated.

"These crystals, when treated with potassic hydrate, yield an oily liquid resembling analine. It boils at 253° C. (uncorrected), and is doubtless paramonamidophenetol. A portion of the salt appears to suffer a further decomposition, so that the amount of oil obtained was very small. This oil combines, like aniline, directly with acetyl chloride to a crystalline solid. In combination with carbon disulphide it also yields a solid body. The writer did not succeed in obtaining this amidophenetol by the action of ammonic sulphide upon the nitrophenetol at high or low temperature.

"The black mass remaining in the flask, after the mononitrophenetol has been distilled off, contains dinitrophenetol, but is difficult to purify."

This "crystalline solid" is said to have been phenacetin, and upon the sentence containing the phrase just quoted the whole defense of anticipation rests. It is, I think, a slender foundation, not sufficient to sustain so great a weight. It would be profitless to review the technical expert testimony concerning this solid, and to repeat the long chemical terms and elaborate formulas that are found in the record. It is enough to state the conclusion at which I have arrived, after considering all the evidence. In my opinion, Hallock's "crystalline solid"—which might have been any one of nine distinct chemical bodies—was probably a poisonous substance, perhaps containing phenacetin, but differing as a whole from that body, and possessing different characteristics. The complainants are, I think, correct in saying that "it was not either in quantity, quality, or condition suitable for chemical or commercial purposes, or for any use," and that "it was not intended for use, and was not known or described as being, or containing, anything capable of any use." Such a substance, vaguely and insufficiently described, neither intended nor used for any useful purpose,—a mere laboratory product, whose qualities were neither known nor stated,—should not be regarded as an anticipation.

Phenacetin is a valuable antipyretic and antineuralgic remedy, and was so recognized immediately by the medical profession. It does not depress or injure the nervous system, and is therefore used in the treatment of many diseases. It has been extensively sold in the United States and elsewhere, the sales in this country between 1890 and 1900 being more than 3,000,000 ounces; this quantity being

equivalent to 150,000,000 doses, the value being more than $10,-000,000. This very useful and valuable product was deliberately sought for by Hinsberg. It came into existence by the exercise of his inventive faculties, and he is entitled to the fruit of his beneficent labor, unless it clearly appears that he was not the first in the field. As I regard the testimony, his claim to priority has not been successfully attacked, and the complainants are therefore entitled to the usual decree, with costs of suit.